NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Petitioners,

v.

Lee M. THOMAS, Administrator, United States Environmental Protection Agency, Respondent,

Alabama Power Company, et al., American Paper Institute and the National Forest Products Association, National Coal Association, Kennecott, Natural Resources Defense Council, Inc. and Sierra Club, State of Ohio, Intervenors.

OHIO POWER COMPANY, Petitioner,

v.

Lee M. THOMAS, Administrator, United States Environmental Protection Agency, et al., Respondents,

Natural Resources Defense Council, Inc. and Sierra Club, Intervenors.

Nos. 85–1488 and 86–1331.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 25, 1987.

Decided Jan. 22, 1988.

As Amended April 13, 1988.

David G. Hawkins, with whom Richard E. Ayers and Howard I. Fox, Washington, D.C., for the Natural Resources Defense Council, Inc., et al., James M. Shannon, Atty. Gen. and Janet G. McCabe, Asst. Atty. Gen., the Commonwealth of Massachusetts, Boston, Mass., James E. Tierney, Atty. Gen. for the State of Maine, Augusta, Me., and Robert Abrams, Atty. Gen. for the State of New York, Albany, N.Y., were on the brief for petitioners.

Robert Whitehead and Kenneth N. Tedford, Asst. Atty. Gen., State of Conn., Hartford, Conn., and Greg Sample, Asst. Atty. Gen., State of Maine, Augusta, Me., also entered an appearance for Natural Resources Defense Council, Inc., et al.

Henry V. Nickel, with whom F. William Brownell and Mel S. Schulze, Washington, D.C., for Alabama Power Co., et al., Donald

C. Winson and Richard S. Wiedman, Pittsburgh, Pa. for Ormet Corp.; Robert F. Stauffer, Washington, D.C. and David C. Branand, Cleveland, Ohio for National Coal Ass'n, and Michael H. Holland and Earl R. Pfeffer, Washington, D.C., for United Mine Workers of America were on the joint brief for petitioners Alabama Power Co., et al. John W. Ublinger, Jr. also entered an appearance for petitioner Ormet Corp.

Lawrence A. Demase, Pittsburgh, Pa., and J. Daniel Hull, Washington, D.C., were on the brief for petitioners Monongahela Power Co. and Potomac Edison Co.

Ann G. Daniels, San Francisco, Cal., entered an appearance for petitioner Environmental Defense Fund, Inc.

Paul H. Schneider, Asst. Atty. Gen., State of New Jersey, Trenton, entered an appearance for petitioner, State of New Jersey.

Charles Carter, Asst. Gen. Counsel, EPA and Lisa F. Ryan, Atty., U.S. Dept. of Justice, with whom Scott Slaughter, Atty. Dept. of Justice, Alan Eckert, Associate General Counsel, EPA and Patricia Embrey, Atty., EPA, Washington, D.C., were on the brief for respondents. Michael W. Steinberg, Atty., U.S. Dept. of Justice and Gaylene Vasaturo, Atty., EPA, Washington, D.C., also entered an appearance for respondents.

Alfred V.J. Prather and Kurt E. Blase, Washington, D.C., were on the brief for intervenor Kennecott.

Dale T. Vitale, Asst. Atty. Gen., Columbus, Ohio for the State of Ohio, was on the brief for intervenor-respondent the State of Ohio.

Henry V. Nickel, F. William Brownell and Mel S. Schulze, Washington, D.C. for Alabama Power Co., et al., Michael K. Glenn, Washington, D.C., for American Paper Institute, et al., and David C. Branand, Washington, D.C., for National Coal Ass'n., were on the brief for intervenors Alabama Power Co., et al. Richard S. Wasserstrom, Washington, D.C., also entered an appearance for American Paper Institute, et al. Robert F. Stauffer, Washington, D.C., also entered an appearance for National Coal Ass'n.

Edwin Lloyd Pittman, Atty. Gen. State of Mississippi and Robert Franklin Spencer, Asst. Atty. Gen., State of Mississippi, Jackson, Miss., were on the brief for amici curiae the State of Mississippi, et al. urging affirmance.

Before RUTH B. GINSBURG and WILLIAMS, Circuit Judges, and AUBREY E. ROBINSON, Jr., Chief Judge, U.S. District Court for the District of Columbia.[*]

Opinion for the Court filed by Circuit Judge WILLIAMS.

I. BACKGROUND ....................................................... 1231
II. STACK HEIGHT VALIDATION: EMISSIONS RATE ASSUMPTIONS IN DEMONSTRATIONS ....................................................... 1233
 A. The Control-First Dispute ........................................ 1233
 B. Demonstrations Supporting Stack Height Increases Within the Formula ....................................................... 1239
 1. Attacks on the formula .................................... 1239
 2. Attacks on the demonstration procedures ................... 1239
 C. The NSPS Presumption for Above-Formula Stacks ............... 1240
 1. Substantive objections ................................... 1241
 2. Procedural challenges .................................... 1242
III. STACK GRANDFATHERING ISSUES ..................................... 1243
 A. Sheltering pre-October 1, 1983 Within-Formula Stack Increases from the Demonstration Requirement ................................ 1244
 B. Automatic Credit to Formula Height for pre-January 12, 1979 Stacks 1246
 1. Credit up to 2.5H for pre-1979 sources showing reliance ..... 1247
 2. Credit up to H+1.5L for pre-1979 sources not showing reliance 1248
 C. EPA's Definition of "Stack Height in Existence" ................. 1248

[*] Sitting by designation pursuant to 28 U.S.C. § 292(a).

 D. Application of New Demonstration Requirements to Sources that
 Have Completed Demonstrations .............................. 1249
IV. PLUME RISE ................................................... 1251
 A. Original Design and Construction as One Stack ................ 1252
 B. General Rule for Merged Stacks .............................. 1254
 C. Partial Grandfathering of Stacks Merged Before July 8, 1985 .... 1255
V. MISCELLANY ................................................... 1256
 A. Multi-Point Rollback ......................................... 1256
 B. Definition of "Nearby" as Used in Demonstrations .............. 1256
 C. Modeling Adjustments for Complex Terrain ..................... 1257
CONCLUSION ...................................................... 1257

WILLIAMS, Circuit Judge:

Under the Clean Air Act as amended in 1970, 42 U.S.C. §§ 7401 *et seq.* (1982), the Environmental Protection Agency sets national ambient air quality standards ("NAAQS") for various pollutants. *Id.* § 7409. Once they are set, each state must adopt and submit to the EPA a state implementation plan ("SIP") providing for achievement of the standards in each air quality control region. *Id.* § 7410(a)(1).[1] Such plans obviously must distribute the necessary pollution cutbacks among the various pollution sources. From 1970 to this day a dispute has raged over the extent to which pollution sources may make their required contribution toward these localized clean air goals by dispersing pollution rather than by reducing their emissions.

Dispersion may be either through space or time. A source may disperse its pollution through space by such devices as "tall stacks," which carry the pollutants away from the region and from the ground levels at which satisfaction of the NAAQS is measured. It may disperse pollution over time by intermittent controls systems ("ICS"), which vary the time of discharges so as to take advantage of changes in weather conditions.

Dispersion techniques vary from emission reductions in two fundamental ways.

They are, at least up to a point, considerably cheaper than emissions reductions. This makes them attractive to industry and often to the states of origin. (The attraction may be particularly great where the state of origin produces high-sulphur coal.) On the other hand, reliance on such techniques increases the aggregate amounts of pollution dumped into the atmosphere. This makes them unattractive to environmentalists and to the citizens of downwind states,[2] to which the pollution will be swept and where acid rain may result.

First the courts and then Congress intervened to prevent states from allowing pollution sources to satisfy their obligations by means of dispersion. As a result, reductions in local ground-level pollution do not "count" toward satisfaction of the NAAQS to the extent that they rely on those dispersion techniques that are disapproved.

While these limitations obviously relate to important goals, the system has a certain eccentricity. The ambient air quality standards are ones to be fulfilled in more than 236 specific *local* areas. The anxiety over dispersion stems primarily from dispersion's impact outside the region of origin. But the means of allaying that anxiety is to disregard, for purposes of measuring contribution to local clean air, conduct which indisputably helps clean local air.

---

**1.** Under 42 U.S.C. § 7407, the country is subdivided into inter-state as well as intra-state regions. As of 1981 there were 236 such regions. B. ACKERMAN & W. HASSLER, CLEAN COAL/DIRTY AIR 65 (1981).

**2.** Of course individuals may also benefit from restrictions on dispersion as residents of the states where the stacks exist, for (as will appear) denial of credit for pollution control through dispersion will result in local sources reducing their pollution by *more than* the amount required for achievement of the NAAQS. However, as the NAAQS are set at levels found by EPA as "requisite to protect" the public health and welfare, 42 U.S.C. § 7409(b), many local residents may feel that the decrease in pollution is not worth the increment in electricity costs.

Yet none of the constraints on dispersion, whether devised by courts, EPA or Congress, has forged an operating link between those constraints and the injuries inflicted by dispersion. Thus, although the parties adduce some figures as to changes over time in total atmospheric "loadings" of sulphur dioxide, these are not related to any statutory goal or to any scheme for attaining specific cutbacks. This incongruity may account for some of the logical difficulties encountered in trying to apply the statute and controlling precedents.

The battle has proceeded in the agency, the courts and Congress. The latter tried to resolve the matter in 1977 by adding a new provision to the Act, § 123, 42 U.S.C. § 7423 (1982), which has not proved at all free of ambiguity. This court reviewed the EPA's 1982 "stack height" regulations in *Sierra Club v. Environmental Protection Agency*, 719 F.2d 436 (D.C.Cir.1983), *cert. denied*, 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984) (*"Sierra Club"*). We affirmed many aspects of those regulations, invalidated two provisions, and directed the agency to reconsider other provisions on remand. In 1985 the agency promulgated a new set of regulations attempting to respond to *Sierra Club*.[3] In these consolidated cases, environmental petitioners led by the Natural Resources Defense Council (and supported by an array of northeastern states)[4] and industry petitioners (supported by an array of middle western states)[5] challenge the amended regulations. We regret to say that we cannot find them in full compliance with § 123 as construed in *Sierra Club*.[6]

## I. BACKGROUND

This court described the statutory provisions at issue in this case, together with their legislative and administrative history, in *Sierra Club*, 719 F.2d at 439–43, and in our earlier opinion in *Alabama Power Co. v. Costle*, 636 F.2d 323, 388–91 (D.C.Cir. 1979). Here we confine ourselves to a brief summary.

Section 110 of the Act directed the EPA Administrator to approve a SIP if it complied with the applicable procedural requirements and included (among other things) "emissions limitations ... and such other measures as may be necessary to insure attainment" of the NAAQS. 42 U.S.C. § 7410(a)(2)(B). The agency initially approved state plans that authorized the

---

**3.** The 1985 Final Stack Height Regulations at issue here appear at 50 Fed.Reg. 27,892 (1985). After their publication, Title 40 of the C.F.R. was reorganized, and these regulations are now codified at 40 C.F.R. Part 100. This opinion, however, will refer to the C.F.R. cites as they appear in the 1985 *Federal Register* notice.

**4.** Petitioners attacking the regulations as insufficiently protective of the environment include NRDC, the Environmental Defense Fund ("EDF"), the Sierra Club, and the states of Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island and Vermont. These parties submitted one consolidated brief, and will be referred to collectively as "NRDC" or the "environmental petitioners."

**5.** Parties petitioning on the ground that the regulations are too stringent, and intervening in support of the agency against the NRDC challenges, include Alabama Power Co., the American Paper Institute, the National Forest Products Association, United Mine Workers of America, Monongahela Power Co., the National Coal Association, Ohio Power Co., Ormet Corp., and the State of Ohio. These parties have been aided by an *amici curiae* brief submitted by the states of Indiana, Mississippi and Georgia. These parties will be referred to generally as

"industry petitioners." Kennecott is an Intervenor in support of the agency's approval of the multipoint roll-back system, an emissions control system challenged by the environmental petitioners.

**6.** Prior to oral argument, petitioner NRDC filed a motion for enlargement of time to submit a supplemental appendix. Soon thereafter it submitted a motion to correct the certified index to the record and file its supplemental appendix. These motions were opposed by both the agency and the industry petitioners/intervenors. The industry petitioners in turn filed a motion requesting the opportunity to tender supplemental briefs should we grant NRDC's motions. NRDC's motion for enlargement of time is, at this point, moot. We have reviewed its supplemental appendix and conclude that nothing contained therein affects our disposition of the case. It is therefore unnecessary for us to consider the merits of NRDC's motion or those tendered in opposition. We deny both the motion to correct the certified index and file the supplemental appendix and the industry petitioners' subsequent motion for supplemental briefing.

use of "tall stacks" and ICS compliance measures. Several courts found this approach illegal, reading § 110 to establish a hierarchy among control techniques. Under the hierarchial view, "other measures" qualified as "necessary" only to the extent that the SIP had exhausted the "emissions limitations" approach, *i.e.*, only where further compliance through such limitations was "unavailable or infeasible." *NRDC v. EPA*, 489 F.2d 390, 410 (5th Cir.1974), *rev'd on other issues sub nom., Train v. NRDC*, 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Big Rivers Electric Corp. v. EPA*, 523 F.2d 16, 21–22 (6th Cir.1975) (involving ICS), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *Kennecott Copper Corp. v. Train*, 526 F.2d 1149, 1153–54 (9th Cir.1975) (involving ICS and tall stacks), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976). (We refer to these cases collectively as the "*NRDC* trilogy.") Round I to the environmentalists.

In 1976 EPA issued guidelines seeking to implement the Fifth Circuit's view of § 110. 41 Fed.Reg. 7450 (February 11, 1976) ("1976 Guidelines"). The guidelines employed a variety of distinctions that continue to haunt the area. First, they focused on the control *credit* that a source could receive for pollution control through stack height. Thus they did not purport to restrict a source's actual employment of a tall stack, but simply limited the extent to which the actual reduction in ground-level pollution achieved by such a stack would count towards compliance with the NAAQS. *Id.* at 7451.

Second, they drew a distinction between stacks that were equal to or less than 2½ times the height of the facility (the "2.5H" formula) and stacks that were taller, favoring within-formula stacks. *Id.*[7]

Third, they looked relatively askance at *increases* in stack height as opposed to stack heights attained in *original construction*, presumably because the former were more likely than the latter to reflect a purpose to avoid emission reduction costs rather than adherence to conventional engineering practice. *Id.*

Fourth, they employed "grandfathering" concepts both with respect to increases and original construction stacks. For example, they treated the stacks of sources that received construction permits before the Fifth Circuit's decision more favorably than those of sources initiating construction later. *Id.*

This is not the place to describe the rather complex pattern that emerged from all these elements. We will return to aspects of the 1976 Guidelines as we go along. For the moment, we note that credit for control through stacks was to be unlimited if the source applied "the best available control technology" ("BACT"), even for the least favored vintage of stack and for stacks of increased height. *Id.* at 7451–52. Stacks initiated before the Fifth Circuit's *NRDC* decision were grandfathered, up to whatever figure the 2.5H formula might produce. *Id.*

In 1977 Congress stepped in with § 123,[8] moved at least in part by concern that the

---

7. In 1981, the agency began defining H as the "height of nearby structure(s)." 46 Fed.Reg. 49,817/1 (Oct. 7, 1981). This minor alteration has no bearing on the current action.

8. Section 123, 42 U.S.C. § 7423, reads as follows:

(a) The degree of emission limitation required for control of any air pollutant under an applicable implementation plan under this subchapter shall not be affected in any manner by—(1) so much of the stack height of any source as exceeds good engineering practice (as determined under regulations promulgated by the Administrator), or (2) any other dispersion technique. The preceding sentence shall not apply with respect to stack heights in

existence before December 31, 1970, or dispersion techniques implemented before such date....

(b) For the purpose of this section, the term "dispersion technique" includes any intermittent or supplemental control of air pollutants varying with atmospheric conditions.

(c) Not later than six months after August 7, 1977, the Administrator, [*sic*] shall[,] after notice and opportunity for public hearing, promulgate regulations to carry out this section. For purposes of this section, good engineering practice means, with respect to stack heights, the height necessary to insure that emissions from the stack do not result in excessive concentrations of any air pollutant in the immediate vicinity of the source as a

1976 Guidelines were too lax. *See Sierra Club,* 719 F.2d at 440. The section in essence elaborates on § 110's references to "other methods," and, to a degree, subordinates the use of tall stacks and other dispersion techniques to emission controls. It creates a new concept, "good engineering practice" ("GEP"), with a complex definition. The methods and distinctions used in the 1976 guidelines reappear, with important variations.

Like the earlier guidelines, § 123 addresses only the issue of *credit* for pollution reduction through dispersion techniques, explicitly stating that the Administrator is not to prohibit increases or restrict stack height. § 123(c), 42 U.S.C. § 7423(c). Further, it builds in at least some significance for the 2.5H formula,[9] specifying that GEP height must not exceed that formula unless the source owner demonstrates to the Administrator that such greater height is "necessary" as that term is used in the GEP definition. Third, it employs grandfathering, but in a more limited sense than did the 1976 guidelines, protecting only stacks "in existence" or dispersion techniques "implemented" before the 1970 amendments (December 31, 1970). § 123(a), 42 U.S.C. § 7423(a). § 123's structure differs from that of the 1976 Guidelines in that it draws no explicit distinction between increases in stack height and original construction.

Although § 123(c) directed the EPA to issue regulations implementing its provisions by February 7, 1978, they did not emerge in final form until February 8, 1982. 47 Fed.Reg. 5864. The Sierra Club

and the Natural Resources Defense Council challenged the regulations in this court under 42 U.S.C. § 7607(b) and prevailed in part. We will not here summarize the holdings of *Sierra Club,* as a summary would be unnecessary for the cognoscenti, meaningless for others. The important aspects of the decision appear throughout this opinion as we address the many current issues.

The upshot was a remand to the agency, with directions to promulgate new final regulations "within six months from the date of issuance of [the] court's mandate," 719 F.2d at 470. The mandate issued on July 18, 1984, after the denial of certiorari by the Supreme Court, 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870. The agency later secured a postponement from the court, and promulgated the final regulations on June 27, 1985. 50 Fed.Reg. 27,892 (1985). Environmental and industry petitioners challenge the revised regulations in this court under 42 U.S.C. § 7607(b)(1), which directs review here for "nationally applicable regulations." Thus, 17 years after the 1970 amendments and 10 years after the enactment of § 123, we again address the permissible scope of reliance on dispersion techniques.

## II. STACK HEIGHT VALIDATION: EMISSIONS RATE ASSUMPTIONS IN DEMONSTRATIONS

### A. *The Control–First Dispute*

The 1982 Regulations allowed sources to build stacks to formula height and to increase existing stacks to formula height at will. But a source seeking credit for

---

result of atmospheric downwash, eddies and wakes which may be created by the source itself, nearby structures or nearby terrain obstacles (as determined by the Administrator). For purposes of this section such height shall not exceed two and a half times the height of such source unless the owner or operator of the source demonstrates, after notice and opportunity for public hearing, to the satisfaction of the Administrator, that a greater height is necessary as provided under the preceding sentence. In no event may the Administrator prohibit any increase in any stack height or restrict in any manner the stack height of any source.

9. The agency carried the 2.5H formula over from the 1976 Guidelines in its initial effort to give meaning to the GEP concept. 42 Fed.Reg. 57,459 (Nov. 3, 1977). It refined this formula in its 1979 proposed regulations, defining GEP stack height as the height of a nearby structure plus one and a half times the lesser of the height or the width of the nearby structure, or H + 1.5L. 46 Fed.Reg. 2608, 2610 (Jan. 12, 1979). The current regulations except from the H + 1.5L formula those pre–1979 sources that relied on 2.5H. 50 Fed.Reg. 27,906/3 (1985), 40 C.F.R. § 51.1(ii)(2)(i). When we use the term "formula height," we are referring to that height dictated by the stack height formula applicable to the source in question.

above-formula stacks was required to demonstrate (by fluid modeling or field studies) that the extra height was "necessary" within the meaning of § 123's definition of GEP ("height necessary to insure that emissions ... do not result in excessive [downwash-induced] concentrations of any air pollutant...."). 47 Fed.Reg. 5865/2 (1982). The agency defined "excessive concentrations" in terms of a "relativist" test: downwash-induced pollutant concentrations were excessive if they exceeded maximum non-downwash concentrations by 40 percent or more. *Id.* at 5869/1.

Though the 40 percent figure is not in itself at issue, a word of explanation is in order. In preparing the 1982 regulations EPA found that downwash increased ground-level pollution concentration levels by about 40 percent where a source's stack was at formula height (*i.e.,* 2.5H). *Sierra Club,* 719 F.2d at 446. As Congress had recognized the 2.5H formula as indicative of traditional engineering practice and therefore presumptively sound, the agency reasoned that any downwash-induced pollution increase exceeding what a formula-height stack would normally produce should be regarded as excessive. *Id.*

In *Sierra Club,* environmental petitioners attacked the relativist test and prevailed. They argued that Congress was content to give credit to stacks only to the extent that their height was necessary to protect human health, so that a downwash-induced concentration could be "excessive" only if it were health-threatening. 719 F.2d at 447. The 40 percent relativist test of course had no direct connection with any health threat.

The relativist-absolute dispute appeared to the court in *Sierra Club* to dissolve into the question whether Congress meant in § 123 to codify a traditional engineering formula or to create a health-and-welfare-based stack height standard. The court found that the statute and its legislative history "disclose[d] sharply conflicting signals," and concluded, after reviewing the question in detail, that "Congress [probably] thought traditional engineering practice and protection of health were the same

thing." *Id.* at 448. But the court also found evidence in the legislative history that Congress recognized that a choice between the two standards would be necessary if traditional engineering practice dictated a height greater than that necessary to protect human health. *Id.* The court concluded that "meeting air quality standards was primary in [Congress's] mind and that good engineering practice was merely a way to do so." *Id.* Finding it unlikely that the 40 percent standard would identify "an absolute pollutant concentration that is dangerous to health," the court remanded to the agency with instructions to "develop a standard directly responsive to the concern for health and welfare that motivated Congress to establish the downwash exception." *Id.* at 450.

The mandate to develop an absolute test revealed an issue that did not exist under the relativist one. Ground-level concentrations are obviously a function not only of stack height and other elements mentioned in § 123's GEP definition, but also of the emissions emerging at the top of the stack. Once "excessive" concentrations are defined in absolute terms, the stack height *"necessary"* to avoid those concentrations on the ground will obviously vary with a source's actual emissions. Thus *Sierra Club* opened a gap in § 123's GEP definition, the gap expressed in the bracketed and emphasized clause below: "height necessary [*given a specified emissions level*] to insure that emissions from the stack do not result in excessive concentrations...."

Although the parties disagree as to how much the assumed emissions rate affects any computation of credit-worthy stack height, they agree on the direction of the impact: high assumed emissions rates entail relatively generous stack credits (and thus relatively high permissible emissions rates), low assumptions the opposite.

EPA's choice of a baseline emissions rate in the 1985 regulations has varied with the particular contexts presented by the rulemaking. The critical decisions have related to the "demonstrations" (consisting of field studies or fluid modeling demonstrations) that the regulations require of sources in

some circumstances. First, sources seeking credit for any stack height *increase* after original construction must (unless the stack is grandfathered) demonstrate compliance with § 123's GEP definition, even though the height for which credit is sought in *within* EPA's formula.[10] 40 C.F.R. § 51.1(kk)(2). Here, EPA has specified that the baseline must be "the emission rate specified by any applicable State implementation plan (or, in the absence of such a limit, the actual emissions rate)." *Id.* NRDC argues that instead the baseline must be that emissions rate which would result from the source's using all "*available methods.*" NRDC Brief at 22 (emphasis added). The parties have dubbed NRDC's contention the "control-first" approach.

EPA also requires a demonstration for any stack height *above* that resulting from its formula (unless the stack is grandfathered). 40 C.F.R. § 51.1(kk)(1). Here it uses as the baseline the rate provided in the "new source performance standards" ("NSPS") promulgated for new power plants under § 111 of the Act, 42 U.S.C. § 7411, unless the source can show that the NSPS rate is unfeasible. This conditional NSPS standard is, of course, a variant of control-first; it is vigorously attacked by industry.[11]

Finally, the baseline emissions rate is relevant to EPA's validation of its formula, a matter that is indirectly at issue here. That validation was based in part on studies from various power plants, the cleanest having an emissions rate of 4.65 pounds of sulphur dioxide per million British thermal units (Btu). J.A. 834. This compares with an NSPS emissions limit of 1.2 pounds per million Btu for plants built between 1971 and 1978, 40 C.F.R. § 60.43(a)(2), and thus

obviously does not fit the control-first model.

In this part we address the general question whether § 123 requires use of control-first and conclude that it does not. Later sections face the baseline emissions rate problem in the specific contexts already mentioned.

▮▮▮▮▮ ·We first address EPA's contention that NRDC's control-first claims are barred by *res judicata*, as it failed to raise the argument in *Sierra Club*. Of course where *res judicata* (claim preclusion) applies, it bars relitigation not only as to all matters which were determined in the previous litigation, but also as to all matters that might have been determined. *Tutt v. Doby*, 459 F.2d 1195, 1197 (D.C.Cir.1972). Moreover, enforcement of the 60–day time limits imposed by the statute providing for review, 42 U.S.C. § 7607(b)(1), requires that issues raised by an initial set of rules be raised within that time limit, not saved for use against the rules that may emerge from a remand.

Neither of these barriers applies here. The issue of the proper baseline emissions rate became ripe only after the *Sierra Club* court remanded for application of an absolute test. While the environmentalists' briefs in *Sierra Club* might have mentioned the issue, they could hardly have induced this court to pass on it before EPA had a chance to do so. They are not, therefore, precluded from raising the matter in the present litigation.

On the merits, we start by noting the scope of our review. If, using "traditional tools of statutory construction," we can discern Congress's intentions in regard to baseline emissions rates, obviously we must give effect to Congress's will. *NLRB v. United Food & Commercial Workers*

---

**10.** These increases account for a substantial share of the pollution dispersed rather than controlled by the utility industry, but the data before us do not indicate precisely how much. NRDC directs our attention to data suggesting that 168 pre–1970 sources have "doubled" their ability to disperse pollution, NRDC Brief at 9–11, but its data combine the effects of stack height increases with those of merged stacks (a practice discussed in part IV, *infra*). *Id.*

**11.** Under the new regulations, sources are also required to undertake GEP stack height demonstrations when a federal, state, or local authority believes that the formula has overestimated their necessary stack height. 40 C.F.R. § 51.1(kk)(3). For purposes of these demonstrations, EPA chose to retain its old relativistic definition of excessive concentrations, and thus had no need to define an applicable emissions rate.

**1236**

*Union, Local 23*, —— U.S. ——, ——, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (citations omitted); *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If we find that "the statute is silent or ambiguous" on the issue, however, we must defer to the EPA's interpretation if it is based upon a "permissible" statutory construction. *NLRB,* —— U.S. at ——, 108 S.Ct. at 421, quoting *Chevron,* 467 U.S. at 843, 844, 104 S.Ct. at 2782, 2783.

■ Before evaluating the various appeals to the dictionary and to legislative history, we think it suitable to note that the view which NRDC says Congress adopted carries drastic implications. Control-first would require each source to assume, for purposes of its stack height credit demonstration, the lowest achievable emissions rate, determined on either a generic or an individualized basis. Although the record does not allow us to infer exactly the impact of the baseline emissions rate on the emissions rate that would emerge (after the stack height credit were calculated and then used to determine the permissible emissions), all parties agree that that impact is substantial. Indeed, that is what the fight is all about. If Congress in § 123 prescribed the use of such a baseline emissions rate, with all its implications for ultimate emissions ceilings, it did so in a remarkably cryptic way.

In the Clean Air Act Congress has formulated standards for development of emissions limits in a variety of contexts. For example, it provided for generic emissions limits for new sources in § 111, 42 U.S.C. § 7411 (1982), spelling out at length the criteria for calculation of the limits. In a variety of other contexts, it has provided —at length—for determination of the lowest feasible emissions level on a source-by-source basis. *See, e.g.,* 42 U.S.C. §§ 7475(a)(4), 7479(3) (mandating use of the "best available control technology" ("BACT") for new sources in attainment areas, and defining the parameters of the standard); 42 U.S.C. §§ 7502(b)(2), 7501(3) (requiring "lowest achievable emissions rate" ("LAER") for new sources in nonat-

tainment areas, and defining LAER); 42 U.S.C. § 7502(b)(3) (requiring "reasonably available control technology" ("RACT") for existing sources in nonattainment areas); 42 U.S.C. § 7491(g) (requiring "best available retrofit technology" ("BART") for pre–1971 sources impairing visibility in national parks and certain other clean areas). NRDC in essence contends that in § 123 Congress mandated agency pursuit of a similar strategy, but without providing a word of guidance. All NRDC's arguments must be assessed in light of one's estimate of the plausibility of any such scenario. We think it quite unlikely.

NRDC argues that its control-first interpretation is consistent with the plain meaning of the statutory language and is clearly supported by relevant legislative history. It argues further that even if the statute were ambiguous, EPA's interpretation is internally inconsistent and therefore invalid.

NRDC contends that the control-first approach follows inexorably from the plain meaning of the word "necessary." Webster's Third New World Dictionary defines "necessary" to mean essential or "indispensable." *Id.* at 1511. It argues that this definition compels a finding that stack height cannot be "necessary" to control ground level pollution unless the source has employed all feasible emission-control alternatives for reaching the desired levels under downwash conditions. NRDC Brief at 22.

But courts have frequently interpreted the word "necessary" to mean less than absolutely essential, *FTC v. Rockefeller,* 591 F.2d 182, 188 (2d Cir.1979); *9 to 5 Organization for Women Office Workers v. Board of Governors,* 721 F.2d 1, 10 (1st Cir.1983), and have explicitly found that a measure may be "necessary" even though acceptable alternatives have not been exhausted. In *FTC v. Rockefeller, supra,* for example, the court said that "the word 'necessary' is not always used in its most rigid sense." 591 F.2d at 188. Specifically, it found that a subpoena could be "necessary" to an FTC investigation even though the Commission had not pursued

"reasonably available alternatives." *Id.*; *cf. Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1261–62 (6th Cir.1981) (statutory term "reasonably necessary" is not absolute and does not require complete absence of alternatives). As these courts have recognized, meaning varies with context; Webster's definition by no means tells us that Congress intended that the baseline emissions rate—an issue that surfaced only after this court's *Sierra Club* decision—must be premised on the source's having employed all available emissions controls.

█ NRDC asserts that the legislative history clearly demonstrates Congress's intent to adopt a control-first posture. The House Committee which drafted § 123 stated that it was "intended to ratify the general thrust, if not the specific holdings, of the three U.S. courts of appeals which have considered the issue of the permissibility of use of intermittent controls, tall stacks, and other dispersion enhancement techniques." House Report at 91–92. The cases cited by the House Report are, of course, the familiar ones of the *NRDC* trilogy, and each found that "other measures" for complying with the NAAQS are "necessary," for purposes of § 110(a)(2)(B) review, only when further limits on emissions were infeasible.

We do not believe, however, that legislative history endorsing the "general thrust" of the *NRDC* trilogy demonstrates that Congress in § 123 itself clearly resolved the exact *degree* of hierarchy appropriate in ranking control above dispersion.

Just as the *Sierra Club* court did not anticipate the present issue, we see no evidence that the courts involved in the *NRDC* trilogy anticipated it. Once one recognizes —as Congress indisputably recognized in § 123—that dispersion through stacks can play a quite legitimate role in protecting health and welfare from downwash, it is not by any means obvious that in calculating the appropriate role of stacks one must assume that reduction efforts have been pushed to the point of infeasibility.

Section 123's concept of GEP stack height not only acknowledges a legitimate role for stacks, but endorses engineering practices developed at a time when emissions were largely unregulated. In fact, Congress gave those practices a specific endorsement in authorizing the EPA to rely on the 2.5H formula in granting credit. *See* § 123(c) (Administrator is only obligated to conduct demonstrations for above-formula stacks). It is true that this court decided in *Sierra Club* that in any potential clash between defining GEP as that height necessary to avoid downwash-induced effects on human health and welfare, and defining it as 2.5H, the former must prevail. 719 F.2d at 448. But that decision did not undermine the statutory assumption that sources might legitimately rely on stacks aimed at protecting health and welfare from emisssions rates such as have prevailed on plants built before Congress's vigorous 1970 intervention into clean air regulation.

Thus it appears to us that the cases of the *NRDC* trilogy simply do not speak to the issue of calculating GEP height, because those courts never even considered the possibility that sources could rely on stacks except when driven to do so by the infeasibility of all alternatives. Legislative history endorsing their "general thrust" therefore cannot answer new questions posed by § 123 itself: "Necessary" as used in the GEP definition of § 123 cannot be answered by reference to the trilogy's construction of the word in § 110(a)(2)(B).

NRDC further points to legislative history that in its view suggests that Congress believed credit should be given only for stack heights needed by "well controlled" sources. In discussing its reasons for granting sources credit for GEP stack height, the House Committee explained that

for many years, good air quality management has meant building a stack sufficiently tall to offset aerodynamic downwash created by structures in the immediate vicinity of the stack. Without some provision for stack height, a plume released downwind of such structure might become engulfed by turbulent eddys [*sic*] within the wake of the structure. When this occurs *even the plume from a*

*well-controlled source* may cause air quality standards (or other requirements) to be violated.

House Report at 93, U.S.Code Cong. & Admin.News 1977, p. 1171 (emphasis added).

We find NRDC's reading strained. It seems clear to us that the Committee was merely justifying its decision to grant credit up to GEP stack height with the observation that even well controlled sources may need to rely on the dispersion engendered by a GEP height stack to avoid excessive local ground-level pollution concentration.

Finally, NRDC points to a number of references expressing disapproval of the use of the dispersion effects of "tall stacks" to meet the NAAQS. *See, e.g.,* House Report at 93 ("the courts have determined that the 1970 act prohibited tall stacks as a final compliance method"); Conference Report, H.R.Rep. No. 564, 95th Cong., 1st Sess. 144 (1977), U.S.Code Cong. & Admin.News 1977, pp. 1077, 1171, 1524 ("Tall stacks are not a means of emission limitation under the Clean Air Act of 1970."). But we noted in *Alabama Power v. Costle* that "tall stack" is "a term that really covers a *too-tall stack.* 636 F.2d 323, 389 (D.C.Cir.1979) (emphasis added). Thus the references merely reiterate the Congress's intent to deny stack height credit beyond the height dictated by GEP; they do not reflect any legislative decisions on how to calculate GEP.

■ Far from finding a clear Congressional intent to adopt NRDC's control-first strategy, we find the statute's use of the term "necessary" to be completely ambiguous. We find no evidence in the statute or the legislative history that Congress ever thought through the question of how to determine GEP or formulated any view on the "control-first" approach. In view of Congress's endorsement of the historic practice of using stacks to protect health from downwash-induced pollution, we think the agency, in adopting existing or SIP-required emissions rates as the baseline for demonstrations to support within-formula height increases, gave the statute a quite reasonable interpretation.

NRDC asserts that even if we find the statute to be silent as to the appropriate emission level assumption, we should reject the agency's approach as internally inconsistent and therefore arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). As noted above, while EPA authorizes use of existing or SIP-required emissions as the baseline for justifying *within-formula* increases, 40 C.F.R. § 51.1(kk)(2), it requires an assumption of NSPS emissions for demonstrations needed to justify *above-formula* stack heights, 40 C.F.R. § 51.1(kk)(1). NRDC claims that as NSPS is defined in terms of technological and economic feasibility, the latter provision reflects the agency's partial acceptance of the control-first approach. The agency's treatment of within-formula increases, it says, is hopelessly inconsistent with its view of above-formula stacks. NRDC Brief at 28–29.

The EPA explained in the rulemaking that it rejected use of existing emissions in the above-formula context for fear of impermissible circularity—"to the extent that [a source's preexisting emissions] limit relied on greater than formula height, it would amount to using a tall stack to justify itself." *See* 50 Fed.Reg. 27,898/2. But we think that § 123 left the agency free to regard this circularity as permissible in the within-formula context, impermissible in the above-formula context. EPA explained that its use of NSPS (the stringent standard applicable to new sources) for above-formula stacks conformed to Congress's expectation that the "credit for stacks above formula height ... be granted only in rare cases." 50 Fed.Reg. 27,898/1.

NRDC is certainly correct when it notes that the circularity problem that attends the use of existing emissions levels for above-formula demonstration purposes also applies to within-formula demonstrations. Where the formula has overstated the stack height necessary to avoid excessive ground level concentrations, the SIP or existing emissions levels may reflect the benefit of the erroneous assumption, so that its use in a within-formula stack height demonstration will inflate the "necessary" stack height. The problem, however, is

plainly less severe than in the above-formula height context. The initial stack height credit was by definition within-formula, thus limiting the source's existing emissions rate, and thus the extent to which the laxity of the process may inflict potential damage. The reliance on the formula in the initial computation establishes an outer bound on the degree of error. This is quite different from the risks entailed by use of existing rates in the above-formula context, precisely where both this court and Congress itself have warned the agency to extend credit only with "utmost caution," *Sierra Club*, 719 F.2d at 450.

Accordingly, we reject NRDC's contentions that § 123 prohibits use of existing emissions rates in within-formula demonstrations and that the discrepancy between the baseline assumptions for above- and within-formula demonstrations renders the latter arbitrary and capricious.

B. *Demonstrations Supporting Stack Height Increases Within the Formula.*

1. *Attacks on the formula.* In the *Sierra Club* litigation the environmental petitioners did not directly challenge the accuracy of the stack height formula. (By then the 2.5H formula had evolved into H + 1.5L, where L refers to the lesser of the height or width of any structure near the stack. Some references are to formulas in the plural because the old 2.5H persisted as to some grandfathered stacks.) They did, however, attack the agency's failure to require demonstrations to justify stack height credit in either of two special cases: (1) when a source raised a preexisting stack, and (2) when federal, state or local authorities believed the formula had overstated the necessary stack height. The EPA in turn defended the omission of such demonstration requirements largely on the ground of the formula's accuracy. 719 F.2d at 456. The court found this faith unsupported by the record, as it was explic-

itly based on the agency's erroneous relativistic conception of "excessive concentrations." [12] *Id.* at 458. The court therefore held that the agency had not considered whether the formulas were an accurate enough measure, in light of the construction of "excessive" concentrations as related to health and welfare, to justify dispensing with a demonstration requirement in the two special cases. It remanded for that reconsideration. *Id.* Thus, despite the absence of direct attack, the *Sierra Club* decision invited reconsideration of the formula, by suggesting to EPA that superior validation of the formula was an alternative to adopting demonstration requirements in the areas specifically found to be vulnerable.

 On remand, the agency provided demonstration requirements not only for the two circumstances specifically disputed in the preceding litigation, 40 C.F.R. §§ 51.-1(kk)(2) (stack height increase demonstration), 51.1(kk)(3) (governmental authority instigated demonstration), but also for sources with porous structures or buildings whose shapes are aerodynamically smoother than the simple structures on which the formulae were based. 50 Fed.Reg. 27,900/2 (explaining the reach of 40 C.F.R. § 51.1(kk)(3)). Given these demonstration requirements, nothing in our *Sierra Club* opinion required EPA to reevaluate the accuracy of its formula. Accordingly, consideration of deficiencies in the formula is barred by *res judicata* (and by the time limits of 42 U.S.C. § 7607(b)(1)), unless we find that the demonstration procedures chosen by EPA are insufficient to fulfill the statutory purposes. We now turn to that issue.

 2. *Attacks on the demonstration procedures.* In *Sierra Club* this court found it proper to assume that large plants of the sort at issue here would have been built in accordance with "good air quality management" practices, or, effectively,

---

**12.** The agency had derived its concept of "excessive" from the formula itself, defining excessive emissions as ones exceeding the percentage increase in ground level concentrations normally occurring with formula height stacks during periods of downwash. 50 Fed.Reg. at 27,893/3; *and* see pp. 1233–34 *supra.* Its subsequent finding that the formula predicted the minimum stack height necessary to avoid excessive concentrations was as unsurprising as it was circular.

GEP as the term is used in § 123. 719 F.2d at 459. The corollary of this was an assumption that post-construction stack increases were not justified by any need to correct downwash-induced dangers to health and welfare. The court said that this assumption could be rebutted in individual cases "only by a reliable indicator" of the height needed for that purpose. *Id.*

EPA responded by imposing demonstration requirements. Under the 1985 regulations, sources seeking credit for height increases must show, through fluid modeling or wind tunnel demonstrations, that the increase is necessary to avoid downwash that would otherwise exceed at least one of several health- or welfare-related criteria (applicable NAAQS, "prevention of significant deterioration" standards covering areas in full attainment of the NAAQS under § 7475(a)(4), or levels amounting to a local nuisance). 40 C.F.R. § 51.1(kk)(2). As noted above, a source is to assume for the purposes of the demonstration an emission level equivalent to the applicable SIP, or, if no SIP applies, to its actual emissions rate. *Id.*

NRDC argues that these emissions rate assumptions undermine the demonstrations, denying them the reliability demanded by *Sierra Club.* As we have noted, an assumption of existing or SIP-required emissions rates plainly gives the demonstrations a certain circularity: the now existing or required emissions rate will have been based on a given stack height, which will then be used to justify a stack height. NRDC Brief at 29.[13] NRDC argues that instead EPA was required to assume the best achievable emissions rate. *Id.* at 22.

We have already rejected NRDC's claims that failure to employ control-first assumptions directly violates § 123 or is arbitrary and capricious in light of EPA's own condemnation of circularity and partial adoption of control-first for above-formula demonstrations. The sole question currently before us, then, is whether EPA's use of existing rates in this context is so defective as to fall short of *Sierra Club* 's reliability requirement.

We note at this point that the agency's failure to establish perfect logic in support of its emissions baseline decision may well stem from the nature of § 123 itself. While its goal is the reduction of overall pollution loadings, at least in part with a view to protect against acid rain in regions distant from the sources, it operates solely on the *means* by which sources meet national goals for *local* health and welfare. It would be startling if implementation of this process did not involve a few logical imperfections.

There appears, in fact, to be no completely logical basis on which to select a baseline rate for any demonstration. If EPA were to use NSPS for all demonstrations, for example, demonstrations would in a sense underpredict the appropriate stack height for sources with higher emissions rates. Assumption of a single *high* emissions rate, conversely, would overpredict the appropriate stack height for cleaner plants. But selecting each plant's existing permitted rate is subject to the circularity objection. In this world of imperfections, we think EPA's choice reasonable. This is particularly so in light of Congress's having obviously contemplated reliance on a historic notion of "good engineering practice," a notion developed during an era of relatively primitive emissions controls. We do not find EPA's methodology for the conduct of within-formula demonstrations arbitrary or capricious.

C. *The NSPS Presumption for Above–Formula Stacks.*

In developing a baseline emissions rate for demonstrations to justify above-formula stacks, EPA initially proposed that sources assume "either (1) the existing, approved emission limit; (2) any applicable technology-based emission limit, such as the new source performance standards (NSPS); or (3) the emission limit that

---

13. NRDC does not suggest that under EPA's regulations a source could *increase* its emissions and raise its stack, justifying the stack height (and thus the increased emissions) by demonstrations employing the latter rate. We do not read the reference in 40 C.F.R. § 51.1(ff)(2) to "the actual emission rate" to encompass such a scenario.

would result from the use of GEP formula stack height, whichever is applicable to the source being modeled." 49 Fed.Reg. 44,882/1. The last phrase clearly indicates that NSPS would be used only for plants to which it applied by virtue of § 111. The final rule was dramatically different. It required each source to assume NSPS emission levels, or, if it could show those to be infeasible, the lowest achievable levels. 40 C.F.R. § 51.1(kk)(1). Industry petitioners strenuously object to this conditional-NSPS assumption on both substantive and procedural grounds.[14]

1. *Substantive objections.* Petitioners raise three distinct challenges to the agency's decision to adopt the NSPS presumption.[15] First, they argue that because Congress did not prescribe the use of a technology-based emissions limit for GEP fluid modeling demonstrations, the Administrator lacks the authority to mandate its use. Alabama Power Brief at 19. As we have already noted in our discussion of NRDC's control-first argument, Congress imposed technology-based emission limitations—NSPS, BACT, LAER, RACT and BART—in a variety of situations. Two of these, BART and RACT, govern pre–1971 sources. 42 U.S.C. §§ 7502(b), 7491(b)(2)(A). Industry petitioners would have us infer from the contrast between those express conferrals of authority, and the absence of any such reference here, that Congress denied EPA the authority to assume such an emissions rate.

▇▇▇ We find the attempt of industry to bar control-first here no stronger than NRDC's effort to require it in the within-formula context. As we noted in discussing NRDC's theory, the record raised considerable doubt whether anyone in Congress even recognized the issue. The si-

lence alone seems to support neither a requirement nor a prohibition. What Congress did in § 123 was to grant broad discretion to the agency, requiring owners of above–2.5H stacks to demonstrate the necessity for the higher stacks "to the satisfaction of the Administrator." 42 U.S.C. § 7423(c). In *Sierra Club* we read the section to mean above–2.5H credit should be granted only with the "utmost caution," 719 F.2d at 447, which the selection of the NSPS baseline seems to reflect.

▇▇▇ Second, industry petitioners assert that the use of the NSPS presumption only for *above*-formula stack height demonstrations will unfairly prejudice sources located in mountainous terrain, since it is in such areas that above-formula stacks are most likely to be found. Industry petitioners argue that this contravenes the will of Congress. Alabama Power Brief at 34. In *Sierra Club*, however, we found a congressional recognition "that the tall stacks provision would have a disproportionately heavy impact on polluters in mountain areas." 719 F.2d at 455. In fact, the court found an affirmative intent to "discourage utilities from locating in hilly terrain, because such locations tend to require very tall stacks, leading to greater dispersion of pollutants." *Id.* at 445. The court adopted that construction in the context of rejecting EPA's claim that it could consider "plume impaction" in computing excessive concentrations. *Id.* at 452–56. As that decision applied even to plants constructed before the adoption of § 123, whose owners were obviously not free to respond to its "discourag[ing]" influence, *Sierra Club*'s interpretation of congressional non-solicitude for plants in hilly terrain was a strong one. Any disadvantages inflicted on such plants by EPA's choice of the NSPS baseline fit readily within our prior reading of the law.

14. NRDC does not directly challenge the agency's above-formula stack height demonstration provisions, which mandate a NSPS emissions level assumption, subject to feasibility constraints. But it does object to EPA's proposals for gauging feasibility, set forth in certain "guidance memoranda." NRDC Brief 28 n. 54. This court has previously held that the memoranda at issue do not represent final agency action subject to review. *NRDC v. Thomas,* No. 85–

1834 (D.C.Cir. Aug. 3, 1986) (Order dismissing petition for review).

15. Besides the three is a frivolous effort to prove that EPA mistakenly read *Sierra Club* as mandating the use of NSPS. This is patched together from arguments in EPA's brief explaining how its efforts to meet the *Sierra Club* remand, coupled with defects in alternative emissions baselines, led it to choose NSPS.

■ Finally, the industry petitioners assert that in order to use the NSPS presumption, EPA must be able to point to substantial evidence that it is attainable by most of the affected sources. But as EPA allows any source to use a higher emissions rate when NSPS is infeasible, there is no need for any sort of generic demonstration that it is normally feasible. Nor was it improper for EPA to place the burden of showing infeasibility on the source owner, rather then assuming the burden of showing feasibility. Congress appears to have intended that above-formula stack height be approved only in "rare circumstances." House Report at 93, U.S.Code Cong. & Admin.News 1977, p. 1171. *Cf. Sierra Club,* 719 F.2d at 450 ("utmost caution" to be exercised in granting above-formula credit). EPA's location of the burden is thus rationally related to the purposes of the statute and well within the Administrator's discretion.

■ 2. *Procedural challenges.* As described above, EPA initially outlined a scheme through which each source would assume its "applicable" emissions rate for purposes of above-formula demonstrations: (1) sources subject to technology-based emission limits would assume those rates; (2) sources not subject to such limits would assume their existing, approved SIP limits; and (3) sources not subject to either of the above would assume the limit that would result if they were to operate with the stack height credit that the formula would produce. 49 Fed.Reg. 44,882/1. Less than two weeks before promulgating the final regulations, the agency informed industry representatives of its decision to adopt instead a uniform (but conditional) NSPS presumption. Because time was short, industry representatives were only able to respond with two short letters strongly urging reconsideration of the new rule. J.A. 1483, 1491 (letters from the Utility Air Regulatory Group ("UARG") and American Electric Power Company). Industry petitioners now assert that this abrupt shift denied them the opportunity to comment afforded by § 4 of the Administrative Procedure Act, 5 U.S.C. § 553.

In the preamble to its Final Rule, the agency sought to undermine this claim by characterizing its 1984 proposal as presenting three distinct alternatives, rather than a coherent three-part scheme. 50 Fed.Reg. 27,898/2. This is quite disingenuous. Nothing in the initial formulation suggested that EPA intended to adopt one of the three rates for universal use. And where EPA was offering alternatives from which it intended to make a choice in its final rule, it said so. *See, e.g.,* 49 Fed.Reg. 44,881/1 (proposing and soliciting comments on two alternatives for the definition of "excessive concentrations"); 44,884/1 (proposing and soliciting comments upon three approaches for modeling "nearby" terrain features).

The EPA can obviously promulgate a final regulation that differs in some respects from its proposed regulation. We recognized in *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 632 n. 51 (D.C.Cir.1973), that "a contrary rule would lead to the absurdity that ... the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary." Thus, this court has held under both the APA and the Clean Air Act that the agency's final rule must only be a "logical outgrowth" of its proposed rule. *Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 547 (D.C.Cir.1983) (citing circuit precedent on this matter).

We think the agency's ultimate choice qualifies—if barely—as a logical outgrowth of the original proposal. Obviously the germ of NSPS was there, as one of the possibly-applicable technology-based limits. Moreover, the primary concern that drove EPA *away from* allowing sources to use existing SIP limits (and thus towards NSPS) was obvious at an early stage: NRDC's constantly asserted control-first theme. *See* 51 Fed.Reg. 27,898/2 (agency rejects use of existing SIP emissions limits because "to the extent that [a source's limit] relied on greater than formula height, it would be using a tall stack to justify itself").

To be sure, EPA never explained in the administrative proceeding why it rejected use of the emissions rate that would flow from use of the formula. In fact, in its Response to Comments the agency defended this option against environmentalist charges that it was incurably circular. J.A. 314–15. Here the agency's lawyer explained that the formula emissions level assumption was inappropriately strict. EPA Brief in *Ohio Power*, Nos. 86–1331, 86–1362, at 28–29. However valid this critique may be, it is little help in showing the *agency's* intellectual path to the NSPS choice. However, as neither the industry petitioners nor anyone else in this litigation advocates that choice, it can hardly have been so attractive that its disappearance came as a shock.

Further, the public comments raised the possibility of adopting a single, technology-based limit. The New York State Attorney General's Office suggested an NSPS assumption for all demonstrations. J.A. 434. This gave industry participants a clear opportunity to shoot the idea down. NRDC attacked each of the three limits set forth in the 1984 proposal, J.A. 829–33, and advocated use of the rate that would result from use of "the maximum degree of control available to the source." *Id.* at 832 n. 6. Though the target raised by this contention was broader than NSPS, it certainly gave industry critics an opportunity both to shore up the non-NSPS components of the original proposal and to attack *any* form of control-first. Nor was industry free to discount these proposals merely because they came from parties favoring a control-first reading of the statute, *see* Alabama Power Reply Brief at 15; there was a clearly foreseeable risk that EPA would reject the environmentalists' reading of the law but proceed to adopt control-first as a matter of choice. This, in essence, is what it did in a limited sphere.

Finally, EPA's warning of the NSPS threat, communicated two weeks before promulgation, gave industry petitioners at least a limited opportunity to focus a direct attack on NSPS. Though severely pressed, they managed to file objections 7–10 days before the final regulations were signed. J.A. 1483, 1491.

Although this case stretches the concept of "logical outgrowth" to its limits, we think it does not reach the breaking point. The NSPS assumption appears to have emerged from the agency's notice and comment process, as the agency responded to others' comments by stripping away the components of the original proposal that it concluded were more vulnerable. Of course, our affirmance of EPA on this point does not require it permanently to resist useful suggestions or critiques that may emerge.

### III. Stack Grandfathering Issues

The agency has in several cases grandfathered stacks and in one instance rejected an industry request for grandfathering treatment. NRDC attacks several elements of the grandfathering as too generous; several firms (including one heavy buyer of electricity) attack the rejection of their claim. The decisions at issue are as follows:

1. EPA limited its demonstration requirement for within-formula stack height increases to "sources seeking credit after October 11, 1983 [the date of our decision in *Sierra Club*]." 40 C.F.R. § 51.1(kk)(2). (The preamble makes clear that the date refers to the time owners *raised* the stack, not the time they "sought" credit. 50 Fed.Reg. 27,899/2.)

2. EPA affords credit up to 2.5H, free of any demonstration requirements (including such as might be imposed by state or local air pollution authorities), for any stack in existence on January 12, 1979, the date when EPA first proposed the more sophisticated formula, H + 1.5L. Pursuant to our remand in *Sierra Club*, this is limited to cases where the owner or operator produces evidence of having relied on the 2.5H formula in establishing its emission limitation. 40 C.F.R. §§ 51.1(ii)(2)(i). EPA also affords credit up to H + 1.5L for any stack in existence on January 12, 1979, regardless of reliance. *Id.* at § 51.1(ii)(2)(ii).

3. For purposes of the grandfathering explicitly afforded by § 123, for stacks "in existence" before December 31, 1970, EPA in the 1982 regulations defined "in existence" in terms of the start of continuous construction or entering into certain types of contracts. 40 C.F.R. § 51.1(gg). We upheld this in *Sierra Club*, 719 F.2d at 464–66. NRDC claims that EPA should have revised this definition in the light of later discoveries about the number of plants advantaged by the grandfathering.

4. EPA has refused to provide any grandfathering for plants that prior to the Final Rule conducted demonstrations to justify above-formula stacks, even though the demonstrations conformed entirely to the then-applicable rules. J.A. 64–65.

Some general principles are applicable to all these issues. First, none of them is governed by the rule adopted in *Georgetown University Hospital v. Bowen*, 821 F.2d 750, 756–58, 760 (D.C.Cir.1987), generally invalidating retroactive rules. The rules there at issue would have limited reimbursements for *past transactions*. All that is at stake here are restrictions on plants' *future emissions*. Retroactivity is involved here simply because enforcement of the demonstration requirement might impinge unfairly on source owners that made investments or other commitments in reasonable reliance on prior understandings.

Second, our decision in *Sierra Club* observed that some of the considerations governing an agency's duty to apply a rule retroactively were

(1) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (2) the extent to which the party against whom the new rule is applied relied on the formed [sic]

rule, (3) the degree of the burden which a retroactive order imposes on a party, and (4) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

719 F.2d at 467 (quoting *Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d 380, 390 (D.C.Cir.1972)). Clearly the issue entails a balancing of the interest in prompt and complete fulfillment of statutory goals against the inequity of enforcing a new rule against persons that justifiably made investment decisions in reliance on a past rule or practice. *Cf. Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d at 390; *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1040 (D.C.Cir. 1987).

We now turn to the specific complaints.

## A. Sheltering pre-October 1, 1983 Within-Formula Stack Increases from the Demonstration Requirement

■ At the outset, EPA invites us to discard NRDC's objection by means of an argument that to us is quite obscure: that the *Sierra Club* court did not insist on a retroactive demonstration requirement, or indeed on any demonstration requirement at all. EPA Brief at 34. The premise seems to be that because EPA's adoption of a demonstration requirement was voluntary, it need not explain its decision not to impose the requirement on pre–1983 increases. The argument does not add up. First, EPA's adoption of a demonstration requirement for increases could be viewed as wholly voluntary only if EPA had set out thoroughly to validate its H + 1.5L formula. This it did not really purport to do, although its preamble contains some favorable—and hotly disputed—observations on the subject.[16]

---

16. The agency asserts that "[s]tacks below formula height are associated with downwash-related violations of the [3–hour $SO_2$, NAAQS] where emission rates significantly exceed the level specified by NSPS." 50 Fed.Reg. 27,897/3. To back up this assertion EPA relies primarily upon its evaluation of five fluid modeling studies which, it claims, demonstrate significant exceedances of the NAAQS. *Id.* at 27,897/1. NRDC argues that because these studies mea-

sured only ten-to-fifteen minute concentrations, they cannot be taken to demonstrate NAAQS exceedances. NRDC Brief at 37–38. As wind speed and direction are highly variable in the real world, one cannot simply extrapolate ten-to-fifteen minute averages to estimate pollution averages for longer periods. Thus, the normal practice is to apply a conversion factor to short-term wind tunnel results. *See e.g.*, "Eastlake 1980" study at B4–B6, J.A. 111–12; EPA Brief at

In any event, the agency found, in light of this court's reading of § 123 in *Sierra Club*, that a demonstration requirement was suitable. That being so, exemption of a large class of increased stacks is an important decision subject to attack as possibly arbitrary and capricious. It would fail that test if it is inconsistent with the retroactivity analysis set forth in *Sierra Club*.

Invoking the first factor identified by *Sierra Club*, NRDC argues that here there simply is no "well established practice." A fluctuating rather than well-established practice presumably counts against grandfathering, as it undermines the actor's claim that its reliance was legitimate. In fact, the record indicates considerable waffling by EPA. There appear to have been new policy moves in 1973, 1976, 1979, 1980, and 1981 and 1982. In its 1973 Guidelines, it actively encouraged sources with short stacks to increase to GEP formula height. 38 Fed.Reg. at 25,701/2 (1973) ("The increase of stack height up to a height consistent with good engineering practice is acceptable without qualification.... For fairly level terrain, good engineering practice is normally taken to be a stack height 2½ times the height of the facility or nearby structure."). In 1976 it responded to the circuit courts' disparaging treatment of its 1973 effort with considerable severity: putting aside stack increases started before the Fifth Circuit's *NRDC* decision, the 1976 guidelines gave credit only for increases by

sources that applied BACT ("best available control technology"). 41 Fed.Reg. at 7451/2–3 (1976). In 1979, after Congress's adoption of § 123, the agency proposed regulations considerably less stringent, allowing sources that raised existing stacks automatic credit up to H + 1.5L, with the proviso that the EPA or a state or local control agency could order the source to justify use of the formula height by demonstrating, through fluid modeling, the existence of "an air quality problem, attributable to downwash." 44 Fed.Reg. at 2614/1 (Jan. 12, 1979). In a 1980 "policy change," sparked by a heightened concern "that use of its GEP formula for stack height increases [was] increasing pollutant loadings and acid rain," the agency tightened again, announcing its intention to require fluid modeling demonstrations for all future stack height increases. 45 Fed.Reg. 42,282/1 (June 24, 1980). Eleven months later, the EPA drew back, leaving in place the scheme adopted in its 1979 proposed rules. 46 Fed.Reg. 28,650 (May 28, 1981). The agency's 1982 Final Regulations moved further in the direction of leniency, granting automatic credit up to formula height for sources raising existing stacks, with no provision for support through demonstrations. 47 Fed.Reg. 5868/3 (1982). Of course it was this rule that the *Sierra Club* court remanded for reconsideration. 719 F.2d at 458–59.

23. Environmental petitioners contend that if the agency had applied a standard conversion factor to the EPA studies, the results would demonstrate conclusively that even the comparatively dirty plants tested did not need formula height stacks to avoid NAAQS exceedances. NRDC Brief at 38. In response EPA asserts only that its analysis of meteorological data for each plant convinced it that use of a conversion factor was not warranted.

In addition to its NAAQS exceedances rationale, the agency asserts that the formula is necessary to prevent short-term emissions peaks that "raise a real prospect of local health or welfare impacts." 50 Fed.Reg. 27,897/3–98/1. We have no doubt that the agency is permitted to consider hazardous short-term conditions as within the sphere of "excessive concentrations." *Cf. Sierra Club*, 719 F.2d at 447 (state nuisance law may provide a proxy for excessive concentrations). However, the agency provides no

support for its assertion that the current formula predicts the stack height necessary to avoid such short-term hazards.

EPA has stated that it did not rely upon industry data to support its short-term peaks rationale, Response to Comments at 40, J.A. 308, and has specifically disavowed reliance upon the only other study cited in its preamble that supports its short-term peak conclusions (Huber & Pooler, "Comments on Peak Ground-Level Concentrations Due to Building Downwash Relative to Peak Concentrations Under Atmospheric Dispersion Processes" (June 10, 1985), J.A. 129). *See* EPA Brief at 27. And while the agency points out that the ten-to-fifteen minute concentrations measured in the fluid modeling studies exceeded the 1300 microgram per cubic meter level specified in the three hour NAAQS, it does not demonstrate that short-term exposures at that level are hazardous.

Clearly the legitimacy of increasing stack height in reliance on regulatory policy has varied radically from period to period. The equities for a firm increasing its stack in the 1976–79 era are slight compared to ones that increased under the 1973, 1979 or 1981 policies. Besides, the policies represent a scatter rather than a clear line, reducing the equities for reliance even on the moments of lax policy. Finally, equitable claims have some tendency to degrade over time; a 15–year 1973 contract for the purchase of high-sulphur coal may have loomed large in 1976 but hardly amounts to anything in 1987.

EPA's defense of its grandfathering decision failed to focus on any of these difficulties. *See* 50 Fed.Reg. at 27,899/3–900/1. Indeed, EPA's policy imposed no requirement of reliance at all, even though it was precisely that omission that persuaded this court to remand the grandfathering issue raised in *Sierra Club*. 719 F.2d at 468.

Against the seemingly weak claims for grandfathering is the possible frustration of the statutory goal. This looks significant. The vulnerability of the formula persuaded EPA to require demonstrations. These demonstrations are impaired by the circularity problem that EPA has recognized. Yet EPA's grandfathering rule allows most of the affected sources to escape even this modest check.

Administrative problems may partly explain EPA's generous grandfathering. An immediate run of demonstrations for all sources that have increased stack height since 1970 would evidently tax the capacity of the facilities for running such demonstrations. EPA Brief at 18. But this alone appears a weak justification, as EPA has the alternative of adopting a formula clearly valid enough to dispense with demonstrations altogether.

Thus we find it necessary to remand. We do not say there is no room for grandfathering on these facts, but the case for it seems unusually weak. Any grandfathering chosen should fit, to a reasonable degree, the variations in regulatory history and degrees of reliance. We recognize, of course, that administrative necessity or *de minimis* principles will prevent a perfect fit; EPA could not be expected to match the six layers of regulatory policy with a six-layer grandfathering scheme. But fidelity to the congressional purpose requires a far more careful effort to address the problem than the agency has yet made.

**B.** *Automatic Credit to Formula Height for pre-January 12, 1979 Stacks*

The regulations provide credit for heights up to formula levels for sources originally built or subsequently raised before January 12, 1979. 40 C.F.R. §§ 51.-1(ii)(2)(i) and (ii). As now written, the rule shelters such sources not only from the requirement of demonstrations initiated by state or local authorities, 40 C.F.R. § 51.1(kk)(3), but also from the demonstration requirements for stack increases. For purpose of our present discussion, we assume that on remand EPA will look to our analysis in part III.A in deciding to what extent (if any) it will shelter older within-formula *increases* from the new demonstration requirements. Accordingly we limit our consideration here to the 1979 grandfathering provision only insofar as it shelters stacks from state-initiated demonstration requirements and only insofar as it applies to credit for stacks at or within their original heights. The rules have this effect for (1) credit up to 2.5H for pre–1979 stacks of sources whose owners relied on the 2.5H formula and (2) credit up to H + 1.5L for all pre–1979 stacks regardless of reliance.

At the outset, and applicable to both types of grandfathering, is the question whether freedom from the necessity for supplying demonstrations, at the behest of government authorities, is of any great importance to the realization of the goals of the Clean Air Act. We cannot detect much importance. As a practical matter, it seems likely that virtually all such requirements would originate with a state, or with a local entity acting with the authority of the state. But 42 U.S.C. § 7410 leaves states completely free to establish more stringent pollution controls than EPA. *See*

*Indiana & Michigan Electric Co. v. EPA,* 509 F.2d 839, 844 (7th Cir.1975); *Appalachian Power Co. v. EPA,* 477 F.2d 495, 498 (4th Cir.1973). Thus no EPA rules on demonstrations could bar a state from insisting on the most onerous demonstration imaginable. The failure to provide for such a demonstration for pre–1979 sources seeking credit within the formulae thus has little practical effect; the statutory interest in retroactive application is modest. On the other hand, the agency must supply some reason for treating pre–1979 sources more leniently than later ones. We now turn to that problem in the 2.5H and H + 1.5L contexts.

■ 1. *Credit up to 2.5H for pre– 1979 sources showing reliance.* In *Sierra Club,* we made clear that the agency was to either justify its faith in the accuracy of the formula or provide a mechanism through which local authorities could force sources within their jurisdiction to prove their need for formula height stacks. As noted in part III.A above, the agency failed to properly validate its formula. It chose instead to promulgate a state-initiated demonstration provision, 40 C.F.R. § 51.1(kk)(3), subject to the grandfathering here at issue.

We have no difficulty upholding this limited shelter. We found in *Sierra Club* that calculation of GEP through use of the 2.5H formula was, until 1979, an established practice and that protection of sources relying on such a practice in their original construction would not "maintain a situation that Congress sought to end." 719 F.2d at 468. Moreover, the states' alternative route to control, noted above, further dilutes the interests supporting retroactivity.

NRDC first contends that EPA's failure to advance a full substantiation of even the H + 1.5L formula utterly prevents it from allowing automatic credit for stacks *originally constructed* in reliance on the 2.5H formula. But the environmental petitioners in *Sierra Club* did not attack the formula at all and attacked the want of demonstrations only for stack height increases and instances where local authorities were

concerned that the formula might overpredict GEP. Thus, once the state option to be more severe is recognized, *Sierra Club* left EPA quite free so far as concerns within-formula original-construction stacks. The sole constraint was that, in grandfathering the difference (for original-construction stacks) between the height yielded by the 2.5H formula and that yielded by the newer H + 1.5L, EPA must afford the benefit only to firms actually relying on the 2.5H figure. 719 F.2d at 468. The agency responded to that aspect of the remand by explicitly conditioning grandfather treatment under the new regulations on such a showing of reliance. 40 C.F.R. § 51.1(ii)(2)(i).

■ NRDC's second objection relates to the exact terms of the reliance requirement. The grandfathering is available where the source owner establishes its reliance on the formula "in establishing an emission limitation," 40 C.F.R. § 51.1(ii)(2)(ii), meaning, all agree, that the agency looks to the source's emission rate rather than its actual stack height. *See also* 50 Fed.Reg. 27,901/2. Thus, if a source built a stack taller than 2.5H, but set its emission limits assuming 2.5H credit, the agency will concede that "a convincing demonstration has been made that the source properly relied on the formula." *Id.* at 27,901/3. Conversely, if such source based its emission limits "on some other stack height credit, such as 2.8H, 3.5H or some other number," the agency would infer that it had not relied on the formula. *Id.*

Here NRDC's objection flows from its reading of our decision in *Sierra Club.* It believes that case to preclude grandfather treatment for sources with stacks taller than 2.5H, relying heavily on the following paragraph, especially its last sentence:

> We hold that the statute does not prevent EPA from allowing its past rule to be applied to stacks built before its new formula was proposed, but that the agency has erred in allowing sources that did not rely on the old formula to use it. Congress was moved to enact section 123 by evidence that during the 1970's many

sources had built tall stacks far above the heights dictated by sound engineering practice. To allow such sources to claim credit for heights up to the 2.5 Rule would be a windfall for them, unjustifiable under either the statute or the equitable considerations that govern retroactivity.

719 F.2d at 467.

The paragraph taken as a whole simply states that allowing sources with above-formula height stacks to claim 2.5H credit *without a demonstration of reliance on the 2.5H formula* would be unlawful. That it does not require EPA to deny credit for the dispersion effects of the part of a tall stack fitting within the 2.5H formula is reinforced by the court's discussion of the burden of retroactivity. The court observed that such a burden might take the form of expensive retrofitting of control equipment or renegotiation of coal contracts. *Id.* at 468. As these consequences derive from the need to change emission limitations, and not from the height of the stack itself, it is clear that the court believed that a source could demonstrate the requisite reliance by demonstrating that it had set its emission limits by reference to the 2.5H formula. As the statute does not regulate actual stack height (and in fact specifically forbids the Administrator from doing so, § 123(c), 42 U.S.C. § 7423(c)), but rather regulates stack height credit, it would be perverse to make grandfathering depend on actual stack height rather than upon emission limitation decisions driven by expectations of allowable credit.

■ 2. *Credit up to H + 1.5L for pre–1979 sources not showing reliance.* As noted above, the states' complete freedom to impose demonstration requirements appears to sap this particular grandfathering of any great significance. Nonetheless, in drawing a distinction between pre–1979 and later stacks, the agency must supply some reason. In this context we cannot identify one.

Before EPA introduced the H + 1.5L formula in its 1979 proposal, the 2.5H formula was the only formula sanctioned by the agency. Thus, not only does the agency

not impose a reliance requirement in this context, but we cannot understand how a pre-1979 source could have relied on H + 1.5L. Even when the statutory interest in applying a rule retroactively is slight, an agency must articulate some equitable rationale for grandfathering. Although we cannot say that there is none, we cannot uphold the decision in the absence of any explanation.

C. *EPA's Definition of "Stack Height in Existence"*

■ In *Sierra Club* petitioners contended that EPA's definition of stack "in existence on December 31, 1970," as used in § 123(a), impermissibly extended protection to stacks merely under construction. The court accepted EPA's view. 719 F.2d at 464–65. At the time, the record before the court indicated that only four to eight plants would be affected by the dispute, and the court mentioned this fact. *Id.* at 465. NRDC now contends that the broader definition will encompass 32–to–98 utility sources, NRDC Brief at 74, and challenges EPA's refusal to reconsider the issue in light of this reassessment of its probable impact.

Although the *Sierra Club* court indisputably mentioned the limited number of plants thought to be affected, its acceptance of EPA's interpretation rested on the view that it was "necessary to make the clause equitable, which was undoubtedly Congress's purpose," 719 F.2d at 465, not on the number of plants affected. We recognize that under the balancing test by which retroactivity is evaluated, frustration of the statutory purpose is a key element militating against non-retroactive application. The new discoveries of affected plants up the ante. But the "in existence" definition did not represent a de novo retroactivity decision by EPA, merely an implementation of Congress's decision. NRDC points us to nothing in the prior rulemaking suggesting that the number of plants affected influenced EPA's choice of the broader definition. *Compare* 46 Fed. Reg. at 49,816/1 (Oct. 7, 1981) (expressing decision to broaden definition without a

word as to the number of plants). Accordingly, we are not confronted with a case where "a significant factual predicate of a prior decision" has been removed, which may sometimes trigger a duty to revisit the issue. *See WWHT, Inc. v. FCC,* 656 F.2d 807, 819 (D.C.Cir.1981); *Geller v. FCC,* 610 F.2d 973, 980 n. 59 (D.C.Cir.1979). EPA's adherence to its prior position is lawful. We would be reluctant in any event to start undermining a six-year-old provision governing the scope of Congress's 10–year–old choice to protect decisions actually made more than 17 years ago.

D. *Application of New Demonstration Requirements to Sources that Have Completed Demonstrations*

Industry petitioners urged the agency to exempt from its new demonstration requirements sources that had already made demonstrations supporting above-formula stacks but employing prior more lenient tests. Response to Comments 333–34, J.A. 65–66. The agency refused, explaining that "[t]he fluid modeling demonstration has no significance apart from showing whether the source qualified for credit *under the stack height guidelines then in effect.*" *Id.* at 334, J.A. 66 (emphasis added). Three power companies (Ohio Power, Monongahela Power and Potomac Edison), and an aluminum manufacturer that is a major buyer from Ohio Power, challenge this rejection. These petitioners challenge the validity of the final regulations in *NRDC v. Thomas,* No. 85–1488, and challenge the agency's denial of their petition for reconsideration of these regulations in *Ohio Power v. Thomas,* Nos. 86–1331, 86–1362.

A preliminary issue raised by petitioners is whether this court or the Fourth Circuit properly has jurisdiction over their claims. § 307(b)(1) of the Act provides for review here of "nationally applicable regulations." 42 U.S.C. § 7607(b)(1). It then states that a petition for review of final action which is "locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." *Id.* ■ Conceivably one might characterize the present grandfathering issue as re-

gional, as its impact evidently falls only on sources in limited geographic areas. Whatever the distribution of affected plants, however, we think the clearly nationwide scope of the regulation is controlling. The section calls for review in local courts of appeals for regulations that are "locally or regionally applicable." If the jurisdictional provision turns on the *de facto* scope of the regulation, choice of the correct forum might raise complex factual and line-drawing problems. Such a complication of the jurisdictional test would waste time and serve little purpose. *See Sharp v. Weinberger,* 798 F.2d 1521, 1524 (D.C.Cir.1986) (Scalia, J.). We believe the clause governing "nationally applicable regulations" provides jurisdiction over both the direct challenge to the regulations and the petition for reconsideration.

■ A second preliminary issue is whether the regulations, which say nothing explicit on the subject, actually invalidate the prior approvals. We believe they do. First, nothing in the regulations expresses any affirmative intent to grandfather such sources. The statute precludes emission credit for stack height beyond GEP. The regulations in turn state the rules for determination of GEP. The fact that a source's stack has been found to comply with a former definition of GEP clearly does not suggest that the stack qualifies under the current, more stringent standard. Moreover, the agency has in many places expressly stated its provision of grandfather treatment, discussed in prior parts of this section of this opinion. It has included none in its articulation of criteria for above-formula demonstrations. Finally, EPA in the preamble to the Final Regulations explicitly denied any intention to exempt post–1970 sources from the above-formula demonstration provisions, 50 Fed. Reg. 27,899/1, and in its response to industry comments explicitly denied any intention to grandfather previously approved plants, J.A. 334. Thus, we conclude that the agency has in fact made a final decision not to exempt these sources.

■ Petitioners make two distinct challenges to the agency's decision. First, they

argue that the failure to honor the stack height credit they received pursuant to valid notice and comment proceedings violates the doctrine of "repose." Ohio Power Company Brief at 20–26. The cases cited for the doctrine all involve agencies' attempts to revoke, in adjudicatory proceedings, previously issued licenses, exemptions, or rights-of-way. *See, e.g., Hirschey v. FERC,* 701 F.2d 215 (D.C.Cir.1983); *Greater Boston Television Corporation v. FCC,* 463 F.2d 268 (D.C.Cir.), *cert. denied,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1971); *Chapman v. El Paso Natural Gas Co.,* 204 F.2d 46, 52–54 (D.C.Cir.1953). In *Greater Boston,* the court described the doctrine as binding an agency "to respect the governance of a final administrative decision for the particular matter there determined." *Greater Boston,* 463 F.2d at 291. The doctrine is not an absolute even where clearly applicable. *Id.* (the finality interests embodied in the doctrine of repose are "dominant but not absolute").

■ Clearly one can make a linguistic argument, as the EPA does, that the matters determined in the earlier demonstrations were only the applicants' entitlements to above-formula credit under the rules then prevailing. This is so, but one could construct similarly narrow definitions of the first decision in each of the above cases. More to the point, it seems that in the context of adjudicatory revocations of adjudicatory grants, special scrutiny is needed to protect legitimate reliance interests from unjustifiable agency shifts in direction.

Here, a new set of duly promulgated rules has substituted more stringent criteria for those prevailing when petitioners made their demonstrations. The risk of capricious agency action is far less severe, as the shift from one set of regulations to another was applicable to a broad range of parties. *Cf. Bi–Metallic Investment Co. v. State Board of Equalization,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915); *Upjohn Co. v. FDA,* 811 F.2d 1583 (D.C.Cir.1987); *American Airlines, Inc. v. CAB,* 359 F.2d 624 (D.C.Cir.), *cert. denied,* 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966). Accord-

ingly, we think the EPA's authority to apply the new criteria to petitioners is not governed by the relatively restrictive bounds of the doctrine of repose, but by the looser ones already employed in the earlier retroactivity analyses of this section.

■ Petitioners' second claim is in fact based on the retroactivity criteria set forth in *Sierra Club* and applied in this section of this opinion. They object that the agency failed to spell out any application of those criteria, rendering its decision arbitrary and capricious. Monangahela Power Company Brief at 15–16. The agency's spare disposition of the subject seems to us to fall, barely, on the "tolerably terse" side of the line, as distinct from the "intolerably mute." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). First, it stressed the importance of the statutory goal. In the preamble to the Final Regulations, it rested its decision to apply the new demonstration requirements to all post–1970 sources on its view that Congress in § 123 did "affirmatively 'intend to alter' " industry reliance upon above-formula height stacks. 50 Fed. Reg. 27,899/1.

On the other side of the retroactivity balance fall the sources' reliance interests. Sources that underwent previous above-formula stack height demonstrations obviously relied on previous EPA guidance in doing so, and the new absolute test, coupled with the NSPS presumption as to emissions, indisputably represents a significant departure from the past requirements. (But EPA noted that regulatory pronouncements since 1970 had consistently placed a higher burden on credits for above-formula stacks. *Id.*) If the new regulations forced the petitioners to renegotiate longterm coal contracts or rendered obsolete major investments in emission control equipment, petitioners might in some circumstances have a strong equitable argument for grandfathering. (Ohio Power makes claims of such commitments; Monangahela, which has not constructed its proposed stack, relies solely on the funds expended

in the earlier demonstration itself.) But as the NSPS presumption can be rebutted by a showing of infeasibility, each source owner will have an opportunity to identify these costs and secure such relief as their size may justify. 50 Fed.Reg. 27,898/2. Thus, the petitioners have not demonstrated that retroactive application of the new demonstration requirement will force them to shoulder a heavy burden.

In fact, the only sunk cost that is directly wasted by the new regulations is the cost of the demonstrations themselves. In the case of one facility that cost was $500,000, in the other $200,000. These figures are hardly negligible, but we should think it a rare case where the costs of securing data could alone entitle a party to grandfathering. We think the agency did not here abuse its discretion.

## IV. Plume Rise

Dispersion of pollutants is greater when a lot of exhaust is combined in a single stack rather than ejected through several. Thus one key indicator of dispersive effect is "plume rise," the distance the exhaust is carried above the top of the stack. We deal here with EPA regulation of such stack combinations. The phenomenon occurs both as (1) a stack originally constructed combining exhaust that might have been handled with several stacks and as (2) a stack built to replace several separate stacks.

Section 123(a) bars credit not only for "too tall" stacks but also for "any other dispersion technique." In its 1982 Regulations, EPA expressed a narrow definition of the practices to be denied credit under this language, and expressly excluded several, including "combining the exhaust gases from several stacks into one stack." 47 Fed.Reg. 5868/3 (1982). The *Sierra Club* court read EPA's explanation of the definition as in essence a weighing of "the likelihood that [the various practices] would be used as dispersion techniques ... and the burden, both on enforcement agencies and on industry, of attempting to differentiate legitimate from illegitimate uses." 719 F.2d at 462. The environmental petitioners

challenged the definition's exclusion of certain practices, including stack combination. They advocated a definition depending on intent: if a source adopted a practice in order to obtain a less stringent emission level or to avoid imposition of a harsher one, the practice would be regarded as a "dispersion technique." Sierra Club Brief (*Sierra Club* litigation) at 36.

The court agreed with Sierra Club that the agency's conception of "dispersion technique" was unduly restricted, and held that "the words ... sweep broadly enough to encompass at least the meaning urged by petitioners; the use of devices, alterations to the stack, or other techniques when they are significantly motivated by an intent to gain emissions credit for greater dispersion." *Sierra Club*, 719 F.2d at 462. The court acknowledged the agency's authority to exempt entire categories of practices on either of two grounds—administrative necessity or the *de minimis* character of the effects. But it concluded that the agency had "fall[en] far short" of demonstrating either. *Id.* at 463. In its remand to the agency, however, the court left open the possibility that the agency could "develop classes of plant improvements that are clearly legitimate or clearly illegitimate" so as to "reduce substantially the number of cases in which a full-scale examination of the motivation for the change will be required." *Id.* at 463–64.

The agency responded to the court's remand by amending its definition of "dispersion technique" to include

> any *technique which attempts to affect the concentration of a pollutant* in the ambient air *by* ... (iii) *Increasing final exhaust gas plume rise by* manipulating source process parameters, exhaust gas parameter, stack parameters, or *combining exhaust gases from several existing stacks into one stack;* or other selective handling of exhaust gas streams so as to increase the exhaust gas plume rise.

40 C.F.R. § 51.1(hh)(1) (emphasis added). NRDC challenges the agency's new intent-based test, arguing that Congress intended to cover all features having dispersive effects, at least to the extent they may ex-

ceed "normal" dispersion. *See* NRDC Brief at 62 n. 121.

■ NRDC urged this court four years ago to adopt a definition of "dispersion technique" based on a source's motivation. This court accepted NRDC's view. The environmental petitioners could then have made their current argument in favor of an effects test. Since *res judicata* (claim preclusion) bars relitigation not only of matters determined in a previous litigation but also ones that a party could have raised, *Tutt v. Doby*, 459 F.2d 1195, 1197 (D.C.Cir. 1972), NRDC is barred. To accept NRDC's invitation to reopen the issue would be to ignore the concern for finality that underlies *res judicata* and create incentives for future strategic gamesmanship. We decline.

■ Nor does the presence of other parties on the brief open up reconsideration of the matter. 42 U.S.C. § 7607(b)(1) (1982) requires that any petition for review of such regulations as these be filed within 60 days after their appearance in the Federal Register. Contentions in favor of an effects test over one of intent were obviously ripe at the time of initial promulgation in 1982. No party offers the slightest excuse for failure to raise these contentions in the challenges to that set of rules. While we have recently suggested a number of implicit qualifications to apparently iron time limits on challenges to agency rules, *National Labor Relations Board Union v. FLRA*, 834 F.2d 191, 195–97 (D.C.Cir. 1987), nothing in that case suggests that a party, fully on notice as to the potential impact of rules upon its interests, is free to sit back while the matter is subject to prolonged and complex litigation, and then challenge remanded rules on the basis that the court's first ruling did not go far enough. Any such interpretation would make a travesty of Congress's efforts to bring litigation of agency rules to a timely conclusion and to protect the likely reliance of affected parties.

Thus the only issue properly before us is whether the agency properly responded to our remand in *Sierra Club*. It endeavored to do so by creating bright line rules with which to discern whether a source's decision to use a single stack was significantly motivated by a desire to achieve a higher degree of pollution dispersal. These are expressed in the subparts of 40 C.F.R. § 51.1(hh)(2)(ii). Subpart (A) exempts stacks "originally designed and constructed" with combined gas streams, and subpart (B) exempts stack mergers occurring as part of a change in operations comprising an installation of pollution controls and a net reduction in allowable emissions of a pollutant. Subpart (C) provides a laxer test, based on grandfathering precepts, for stack mergers occurring before July 8, 1985 (the date of the rules' appearance in the Federal Register). For them, exemption applies if the merger occurred either as part of a change in operations that included installation of emissions control equipment *or* was carried out for "sound economic or engineering reasons." NRDC objects to each of these classes of exemptions. We address them in turn.

## A. *Original Design and Construction as One Stack*

■ A person with only the notoriously risky "little knowledge" of our air pollution control laws might suppose that the pollution effects of this exclusion must be *de minimis*. After all, we are talking only of post–1970 stacks, and original-design post–1970 stacks should be attached to post–1970 plants, which in turn should be subject to NSPS emissions rates. If SIPs are unlikely to impose stricter controls than NSPS, then nothing would be at stake.

NRDC asserts, however, that as many as 56 post–1970 plants are not covered by NSPS, and it appears that of these 25 have a combined stack as part of their original design. ICF Inc., Final Analysis of the Proposed Stack Height Regulations, June 1985, Appendix D, *reprinted in* NRDC Brief, Addendum B. EPA appears not to contest the point, and indeed has not invoked the *de minimis* concept to justify its decision. Accordingly, we plunge ahead on the premise that something of moment is at issue.

The agency provides three arguments in support of this exemption. Each of them appears to us, for one reason or another, to misfire. While we do not by any means find that the EPA's conclusion is in violation of statutory authority, we are unable to conclude that it rests upon "reasoned decisionmaking." *See SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) ("We may not supply a reasoned basis for the agency's action that the agency itself has not given."); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971) (the court must intervene if the agency "has not genuinely engaged in reasoned decisionmaking").

First, EPA rests on the text of our opinion in *Sierra Club* and on concepts of ordinary language. It notes that original design characteristics do not *increase* plume rise, so that, it says, they cannot be dispersion techniques. 50 Fed.Reg. at 27,903. It cites *Sierra Club*'s references to dispersion techniques as "alterations to the stack," "changes in stack dimensions," and "improvements" in support of this reading of the statutory language. EPA Brief at 60, citing 719 F.2d at 462–64.

We think the observations of *Sierra Club* on the subject are highly inconclusive. The passages cited by the EPA appear to have been merely mentioning examples, not attempting an exhaustive list. Elsewhere the court used potentially more inclusive language. *See* 719 F.2d at 462 (noting that the statutory term would reach "the use of devices ... when they are significantly motivated by an intent to gain emissions credit for greater dispersion").

So far as ordinary language is concerned, clearly nothing inherently prevents the term "dispersion technique" from encompassing a practice adopted during the facility design phase. Moreover, the statute itself does not use the term "increase," with its connotation of change from the levels produced by an existing condition. That term appears only in the *EPA's* definition of dispersion technique. 40 C.F.R. § 51.1(hh)(1)(iii) ("any technique which attempts to affect the concentration of a pollutant in the ambient air by ... [i]ncreasing final exhaust gas plume rise by ... selective handling of exhaust gas streams").

Second, the EPA argues that treatment of original design stacks as dispersion techniques raises insuperable administrative difficulties, namely determining what stack configuration a firm would have adopted in lieu of a unified stack. Indeed, EPA could not necessarily assume that the size of the plant's units would have been the same. *Cf. Sierra Club*, 719 F.2d at 462 (endorsing exemption of a class of practices if the agency could demonstrate that "attainment of the statutory goals is impossible"). As articulated by EPA, however, these difficulties do not seem enough standing alone. NRDC has suggested one plausible solution, that of using average plume rise as of 1970 as a proxy for normal plume rise. NRDC Brief at 62 n. 121. Indeed, the agency's August 1984 draft of the current regulations would have established assumptions as to normal plume rise for source categories through a comparative analysis of stack parameters. Rebuttal Comments 61, J.A. 865. EPA's rejection of both these alternatives is unexplained, leaving the claim of undue enforcement difficulty inadequately supported.

Finally, the agency asserts that stacks are often merged pursuant to original facility design for legitimate economic or engineering reasons. It points out, for instance, that it is less expensive to build one large stack than three smaller stacks, and also less costly to fit one stack with pollution control equipment than to install such equipment in multiple stacks. 50 Fed.Reg. at 27,903. EPA suggests that because there are legitimate nondispersion-related reasons for merging gas streams, and mergers for the purpose of increasing plume rise are "only a theoretical possibility," its decision to exempt all originally designed merged streams is justified.

The difficulty with this argument is that, given other data in the record, it appears not to satisfy EPA's own test of "intent" to obtain dispersion benefits. NRDC points to evidence indicating that power plants have long realized that merged gas streams can significantly increase plume rise, and that firms have purposefully designed plants to take advantage of this increased dispersion since the early 1960s. A.J. Clarke, "The Application of Air Pollution Research to Power Station Design," *Phil. Transactions* (Roy.Soc.London), Nov. 13, 1969, at 265, 269–72, J.A. 862 n. 25. Thus the record, viewing it most favorably to the EPA position, appears to suggest dual purposes, each alone sufficient to explain sources' selection of the single-stack option.

Conceivably EPA might rest on the view that the existence of a sufficient non-dispersion motive exonerates a practice, *i.e.*, establishes its failure to meet the *Sierra Club* intent test. Although the language of *Sierra Club* is ambiguous, and the matter was not at issue, the court appears likely to have contemplated a different view—that the presence of dispersion intent as a sufficient motive, or as a motive crucial (in combination with others) to tilt the decision in favor of a single stack, would render the device a dispersion technique. *See* 719 F.2d at 463 (suggesting that the EPA could not find a lack of dispersion intent for an entire class of techniques unless it could demonstrate that "there is in fact no or little incentive to implement these techniques because the potential reduction in emissions limitations would not be worth the cost"). But in fact the EPA appears to have rejected the narrower test. *See* 50 Fed.Reg. 27,902/3 ("a pure 'but for' test runs the risk of creating exclusions that effectively swallow the rule itself"). Thus, so far as we can grasp it, the EPA believes a source characteristic should be presumed a dispersion technique if dispersion purposes alone provide a sufficient motivation, regardless of the strength of other purposes. If so, EPA's findings of legitimate nondispersionary purposes are not enough, by its standards, to exonerate an original-construction single stack.

To sum up: EPA relies on (1) a notion of "increase" that it never tries to substantiate; (2) administrative difficulties that it asserts without negating the solutions proposed by others and itself; and (3) the existence of a sufficient alternative purpose, which (assuming it is substantiated) is not enough under its own apparent view of the law. The total is three flawed reasons. While in some cases they might form a tenuous sort of tripod, here they seem to us to fail. According to NRDC's undisputed claim this issue accounts for a large fraction of the dispersed emissions at stake. It is fair to demand more, loath as we are to prolong the agony of this process.

Obviously we owe the agency deference if it affords a reasoned explanation, consistent with what Congress has "clearly" required or (in the absence of a clear mandate) with a "reasonable" interpretation of the statute. *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). The present record, however, does not appear to bring us to that point.

## B. *General Rule for Merged Stacks*

As noted, this rule exempts stack mergers effected as part of a change in operation that includes the installation of pollution controls and is accompanied by a net reduction in the allowable emissions of a pollutant. This exclusion only applies to the emission limitation for the pollutant affected by the change in operations. 40 C.F.R. § 51.1(hh)(2)(ii)(B). NRDC argues that this exemption is potentially too lenient by noting the hypothetical possibility that a source could use merger credit for "increment expansion" purposes under the prevention of significant deterioration (PSD) program, 42 U.S.C. § 7470 *et seq.*, thus enabling the source to meet PSD requirements at reduced expense. NRDC does not spell out the objection in any detail. Mere allusion to such a hypotheti-

cal is not enough to persuade us that the exemption represents an abuse of the Administrator's discretion.

### C. *Partial Grandfathering of Stacks Merged Before July 8, 1985*

 Such mergers qualify for exemption if a source can demonstrate that its merger was accomplished as part of a change in operation to install pollution control equipment or for good economic or engineering reasons. 40 C.F.R. § 51.1(ii)(2)(ii)(C). The rule creates a presumption of intent to gain emissions credit in two cases: (1) where there was an increase in the emission limitation after the merger; or (2) where there was no emission limitation in existence before the merging but the quantity of pollutants actually emitted increased in comparison to the pre-merger levels. *Id.*

NRDC attacks EPA's retroactivity analysis, claiming that the agency has not supported its decision to apply a more lenient rule to pre–1985 mergers than to post–1985 mergers. First, it maintains that before 1985 there was no "well established practice" of allowing credit for dispersion resulting from stack merger. NRDC finds evidence of a more severe approach in EPA's 1976 Guidelines and the 1979 proposed regulations. It substantiates the former solely with one letter from a regional EPA administrator disapproving credit for a particular merger, and the latter with quotation of the proposal's vague language ("other selective handling of exhaust gas streams so as to increase the exhaust gas plume rise"). NRDC Brief at 60, 61 n. 119. The agency asserts the existence of a uniformly permissive rule, pointing to three 1980 guidance documents which "uniformly took the view that merging of separate stacks into a single stack 'is generally not considered a dispersion technique' absent other factors." 50 Fed.Reg. 27,903/2. We find the evidence in this regard to be somewhat inconclusive.

Second, NRDC argues that the agency erred in not requiring a demonstration of reliance. The agency responds that it is infeasible to require a demonstration of "actual reliance" when the reliance in question is upon general agency guidance rather than a specific formula or rule. EPA Brief at 66. The point is well taken. Thus, for us, the question comes down to whether the agency's rule for pre–1985 sources is sufficiently protective of the statutory purpose.

NRDC asserts that the regulations provide large loopholes for mergers that were significantly motivated by an intent to gain increased dispersion credit. As to mergers accompanying installation of pollution control equipment, it suggests that a source might intentionally install equipment for one pollutant in order to secure the right to increase emissions of another. On the facts, this seems most improbable. The rule applies only to pre–1985 mergers, and we doubt many source owners had the foresight to anticipate EPA's exemption and slip through its supposed loophole before its promulgation. Further protection is added by EPA's presumption of a significant dispersion motive where the merger was accompanied by a relaxation of emissions limits or an increase in emissions.

As to the exemption for mergers made for "sound economic or engineering reasons," NRDC objects not on the basis of that language itself but by reference to language in a "Guidance" document later published by EPA, "Implementation of Stack Height Regulations—Exceptions From Restrictions on Credit for Merged Stacks" at 3 (October 28, 1985). In a separate suit brought by NRDC before this court we declined substantive review of that document on the ground that the guidelines "represent tentative agency positions that may be modified in subsequent agency proceedings," and "do not represent final agency action subject to judicial review under 42 U.S.C. § 7607(b) (1982)." *NRDC v. Thomas*, No. 85–1488 and consolidated cases (D.C.Cir. Aug. 3, 1986). NRDC has brought nothing to our attention that would increase their finality.

**1256**

Accordingly, the substantive review now appropriate reveals no illegality in EPA's rules for pre–1985 stack mergers.

## V. MISCELLANY

### A. Multi–Point Rollback

 NRDC argued in a footnote in its opening brief that a system of calculating emissions limitations known as multi-point rollback ("MPR") is a form of intermittent control system ("ICS"), and is therefore unlawful under the statute. § 123(b) states that dispersion techniques include "any intermittent ... control of air pollutants varying with atmospheric conditions."

MPR in fact involves calculating emission limits in light of the fact that a certain proportion of days will involve relatively high dispersion; it allows the source to emit more on an *equivalent proportion* of days. But the days of higher emission need not correspond with the actual days of higher dispersion. We think that under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), EPA was entitled to read the statutory language as referring only to control systems that varied output with the time of actual weather changes. We join the Ninth Circuit in upholding the agency's reading. *See Kamp v. Hernandez*, 752 F.2d 1444, 1451–52 (9th Cir.1985).

### B. Definition of "Nearby" as Used in Demonstrations

 Section 123(c) defines GEP stack height as that height necessary to insure that emissions from the stack will not cause excessive pollution concentrations as a result of downwash created by "the source itself, *nearby* structures or *nearby* terrain obstacles." 42 U.S.C. § 7423(c) (emphasis added.) In its 1982 Regulations, the agency's articulation of its formula considered structures only if located within one-half mile of the source. Its provision for demonstrations provided no similar limit on the structures or terrain features to be taken into account. In *Sierra Club*, this court upheld the one-half mile definition of "nearby" used in the formula as consistent with the statute and legislative history, 719 F.2d at 444, but criticized the agency for not applying the same restriction in its rules for demonstrations. The court remanded for EPA to "include new regulations that apply the same 'nearby' limitation to demonstrations as is applied to the formulas." *Id.* at 445–46. The agency proceeded to do so. 40 C.F.R. § 51.1(jj)(2).

Industry petitioners, noting an EPA statement that the *Sierra Club* "court required EPA to apply the half-mile limit to the definition of 'nearby' in fluid-modeling demonstrations," J.A. 286, argues that EPA erroneously supposed that *Sierra Club* bound it to the half-mile figure and therefore failed to exercise its discretion to determine whether a different definition might be more appropriate for demonstrations. Alabama Power Brief at 40–42. *See Phillips Petroleum Co. v. FERC*, 792 F.2d 1165, 1169 (D.C.Cir.1986) ("deference ... is only appropriate when the agency has exercised its *own* judgment. When, instead, the agency's decision is based on an erroneous view of the law, its decision cannot stand") (emphasis in original).

We agree with the petitioners that this court did not mandate a one-half mile restriction for demonstrations. Rather, it held that the one-half mile restriction was a reasonable exercise of the Administrator's statutory discretion as applied to the formula, and also that the Administrator must apply in demonstrations the same numerical limit as it uses in application of its formula. If we thought that the agency had misread *Sierra Club* to preclude its choice of some other numerical limit, we would remand the issue for further consideration.

In fact, however, we do not read the quoted language as indicating such a mistake. So far as appears no petitioner asked the agency to reconsider the half-mile figure for formulas. Accordingly, when the agency spoke of the compulsion

of *Sierra Club,* we think it meant only that, there being no further debate on use of the half-mile figure for the formula, *Sierra Club* required it to employ that figure for demonstrations.

### C. *Modeling Adjustments for Complex Terrain*

"Plume impaction" occurs when a stream of exhaust gases hits a higher hill or mountain downwind before dispersion, causing high concentrations on the mountainside. 719 F.2d at 452. To take account of this phenomeon, the agency gave credit in its 1982 Final Regulations "for the amount of its stack necessary to ensure that violations [would] not occur on the mountain as a result of the amount of the mountain's height that is above GEP height." *Id.* This court found "much to commend EPA's action from a policy perspective," but concluded that § 123 did not permit such an adjustment. *Id.* at 455. The court therefore reversed the agency's "attempt to reduce emissions limitations by [credit for] so much of the stack height as needed to avoid plume impaction." *Id.* at 456.

Pursuant to this court's holding on the matter, the agency included no provision for plume impaction credit in its 1985 regulations. Industry petitioners recognize that the agency is precluded from reintroducing plume impaction credits. Alabama Power Brief at 45. However, they maintain that unless the agency adjusts its complex terrain screening models to account for the existence of plume impaction, sources will be treated as if they were violating NAAQS in mountainous terrain when in fact they have avoided such violations by building appropriately tall stacks. *Id.* at 45–47. They therefore urged the agency during the rulemaking to make "adjustments to its overpredictive complex terrain screening models." *Id.* at 45; *see also* J.A. 557–81.

EPA rejected the proposal because it found that

"[m]anipulation ... of modeling parameters to avoid predicting theoretical plume impaction where actual stacks have been constructed above GEP would be tantamount to granting the same impaction credit that was invalidated by the [*Sierra Club*] court." 50 Fed.Reg. 27,904/2.

The actual meaning of EPA's remark is not fully clear to us. In a currently ongoing rulemaking EPA is revising its "Guideline on Air Quality Models" and is evaluating the merits of the "Rough Terrain Display Model" advocated by industry. 50 Fed.Reg. at 27,904/2. The outcome of this rulemaking will presumably delineate what the agency believes is permissible and what is not. There being no final decision on the subject, we may not intervene.

### CONCLUSION

We uphold the agency except as to its grandfathering of pre-October 1, 1983 stack increases from demonstration requirements (part III.A), grandfathering of pre-January 12, 1979 original height stacks up to H + 1.5L (part III.B.2), and exemption of original construction single stacks from its "dispersion technique" definition (part IV.A). These we remand to the agency for proceedings consistent with this opinion.